Lowell KATT, On Behalf of Himself and All Others Similarly Situated, Plaintiff,

v.

TITAN ACQUISITIONS, LTD.; United Technologies Corporation; William Trachsel and Ari Bousbib, Defendants.

No. 3–99–0655.

United States District Court, M.D. Tennessee, Nashville Division.

Nov. 17, 2000.

Stanley M. Chernau, Linda F. Burnsed, Chernau, Chaffin & Burnsed, PLLC, Nashville, TN, George Edward Barrett, Barrett, Johnston & Parsley, Nashville, TN, Darren J. Robbins, Randall J. Baron, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego, CA, Steven E. Cauley, Law Offices of Steven E. Cauley, P.A., Little Rock, AR, for Lowell Katt, plaintiff.

George Edward Barrett, Barrett, Johnston & Parsley, Nashville, TN, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego, CA, for Ron L. Baughman, Kent Boysen, Daryl R. Cook, Gary L. Exner, Harold P. Exner, Mark J. Linstroth, Mary J. Linstroth, Russell Smith, Jonathan Sleeper, plaintiffs.

Ames Davis, Nancy S. Jones, Waller, Lansden, Dortch & Davis, Nashville, TN, for Titan Acquisitions, Ltd., defendant.

Nancy S. Jones, Waller, Lansden, Dortch & Davis, Nashville, TN, for United Technologies Corporation, William Trachsel, Ari Bousbib, defendants.

## MEMORANDUM

HAYNES, District Judge.

■ Plaintiff, Lowell Katt, an investor, filed this class action[1] on behalf of himself and similarly situated investors, under Section 14(d)(7) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(d)(7), and Rule 14d–10 promulgated thereunder, against the defendants: Titan Acquisition Ltd. ("Titan"); United Technologies Corporation ("UTC"); William Trachsel, a UTC corporate officer; and Ari Bousbib, Titan's president. Plaintiff's claims arise from Titan's tender offer for all outstanding shares of International Comfort Products ("ICP") in which plaintiff owned shares. The tender offer price for ICP stock was $11.75 per share. Plaintiff alleges that the defendants violated the "Best Price Rule" in Section 14(d)(7) by agreeing that upon consummation of the tender offer, Titan would honor its various agreements with ICP and certain of its officers, who are also ICP shareholders. The "Best Price Rule" requires a company making a tender offer to pay all tendering shareholders the same price for their shares.

■ Plaintiff's specific claim is that these various financial agreements provided for continued salary and accelerated incentive payments to ICP officers in the event of a change in control of ICP and the termination of the ICP officer's employment. These contracts were executed in the months shortly before Titan and UTC announced the formal tender offer. These agreements were to get these corporate officers to urge other investors to sell their stocks and to ensure a smooth transfer of ownership of ICP to UTC. These agreements are alleged to constitute additional

---

1. Defendants note that plaintiff's lead counsel had two other actions challenging the consideration paid to ICP officers and employees. The first action was in a Tennessee state court against ICP and the ICP directors for breach of fiduciary duty for failure to obtain "the best offer possible," that the Chancery Court of Marshall County, Tennessee dismissed, for lack of subject matter jurisdiction. The Court concluded that Canadian law governed plaintiff's breach of fiduciary duty claims against ICP, a Canadian corporation, and that such claims could be brought only in Canada. The second action, a derivative action, is pending in Ontario, Canada for corporate waste and breach of fiduciary duty based on the incentive arrangements at issue here.

consideration paid to those ICP shareholders that were not paid to the plaintiff and other ICP stockholders in violation of Section 14(d)(7). For relief, the plaintiff seeks class relief of equal value to these agreements that Titan agreed to pay ICP management officers who were also ICP shareholders.

Before the Court is the defendants' motion to dismiss (Docket Entry No.8), in which the defendants argue, in sum:(1) that an implied right of action does not exist under Section 14(d)(7); (2) that Section 14(d) and Rule 14d–10 apply only to payments "during the Tender Offer" and are inapplicable here because the agreements at issue were made "before" the commencement of the tender offer and Titan agreed to pay the insiders only "after" the tender offer closed; and (3) that the Best Price Rule is inapplicable to agreements between the target company and its officers.

In response, the plaintiff argues that there is not any time limitation in Section 14(d)(7) nor Rule 14d–10. Moreover, the plaintiff asks the Court to adopt the test of other courts that if, these agreements were effectively made pursuant to or were integral parts of Titan's tender offer, then Section 14(d)(7) and Rule 14d–10 apply.

■ For the reasons set forth below, the Court adopts the "integral part" and "functional" tests of the Second and Ninth Circuits to conclude that under the facts alleged here, Titan's financial incentive agreements with ICP officers who were also shareholders were integral parts of Titan's tender offer for ICP. These agreements were signed shortly before Titan's tender offer; are structured to assure Titan's successful acquisition of ICP; and therefore are deemed integral parts of Titan's tender offer and are subject to Section 14(d)(7) and Rule 14d–10.

**2.** The allegations in the Complaint appear to be based upon disclosures made in Titan's Tender Offer Statement and the Schedule 14D–9 filed by ICP on June 30, 1999 ("14D–

## A. Analysis of The Complaint

Plaintiff, the former holder of 10,000 shares of ICP common stock, alleges that on June 24, 1999, defendants UTC and Titan, a wholly-owned subsidiary of UTC, announced their "Pre–Acquisition Agreement" on Titan's proposed tender offer for the outstanding shares of ICP at $11.75 per share with a total consideration of approximately $479 million. (Docket Entry No. 1, Complaint at ¶ 4). On June 30, 1999, Titan filed with the Securities and Exchange Commission ("SEC") its Tender Offer Statement on Schedule 14D–1 ("Tender Offer Statement"),[2] to explain the procedure for tendering shares. *Id.* Plaintiff alleges that he tendered his ICP stock. *Id.* at ¶ 8.

In connection with the tender offer and prior to its announcement, Titan agreed to "pay certain ICP Insiders additional consideration of as much as $30 million which Titan did not offer to pay to other shareholders." *Id.* at ¶ 2. According to the Complaint, each ICP officer was offered additional payments ranging from "up to $1.7 million" to "up to $4.857 million." *Id.* This additional consideration allegedly was offered to certain ICP officers—W. Michael Clevy, President and Chief Executive Officer; David P. Cain, Senior Vice President and General Counsel; Stephen L. Clanton, Senior Vice President and Chief Financial Officer; Augusto H. Millan, Senior Vice President and General Manager; David B. Schumacher, Vice President; Herman V. Kling, Senior Vice President; and James R. Weise, Senior Vice President (collectively, the "ICP officers"). *Id.* at ¶¶ 2, 3, and 14–20. The alleged purpose of their compensation packages was "to entice [the ICP officers] to tender their own shares and recommend that the ICP shareholders tender their … shares." *Id.* at ¶ 25.

9"). *See* Docket Entry No. 1, Complaint at ¶ 4, that are annexed as Exhibits A and B of Nancy S. Jones' affidavit (Docket Entry No. 10, Jones Affidavit).

### 1. "Golden Parachute" Agreements

Among the additional consideration for these ICP officers, plaintiff identifies control agreements or "Golden Parachutes" agreements between ICP and certain ICP officers executed on March 15, 1999. *Id.* at ¶ 21. Under these agreements, the ICP officers would receive change in control bonuses and accelerated "incentive awards and performance unit awards" if the officer's employment were terminated after a change of corporate control by a tender offer. *Id.* at ¶¶ 25 and 27. Allegedly, "the net payment to be made as a result of the 'change control' bonus is more than $1.2 million, $330,000, $359,000, and $357,000, respectively for [ICP officers] Clevy, Cain, Clanton and Millan." *Id.* at ¶ 26. According to the complaint, the change of control bonus may be taken, if the ICP officer elected to do so, as a "lump sum" with the consummation of the tender offer and merger. *Id.* The bonus component of these Golden Parachutes agreements guarantees continuation of the executive's salary for periods ranging from 18 to 36 months after his termination. *Id.* at ¶ 26.

### 2. The Accelerated Incentive Awards

The incentive component of the Golden Parachutes agreements gives an acceleration of awards under ICP's preexisting Annual and Long Term Incentive Plan that has been in effect since January 1, 1999 and was sent to ICP shareholders in connection with ICP's May 19, 1999 annual meeting.

In addition to the Golden Parachute payments, UTC "offered 'sign on' bonuses to Kling, Schumacher and Weise of ICP of $100,000 and the opportunity to convert certain severance benefits and stock awards," if they accepted employment with UTC after the takeover. *Id.* at ¶ 28. Titan also agreed to pay certain ICP managers a Retention Bonus "as part of the Tender Offer, to be paid by the Company within 60 to 90 days after the consummation of the Offer ..." *Id.* at ¶ 29. The payment of a Retention Bonus was contingent upon their continued employment as ICP officers. The 14D–9 disclosed that:

> The Company [ICP], in consultation with Parent [UTC], also has adopted an incremental bonus plan for certain senior officers in respect of services to be provided by such officers in connection with the transition of the Company's ownership to Purchaser [Titan]. The bonus plan will provide for bonuses to be paid by the Company within 60 to 90 days after the consummation of the Offer and will involve aggregate payments of approximately $1 million (U.S.). With the exception of Mr. Clevy, who is proposed to receive $500,000, the participants and the amounts to be paid ... have not yet been determined....

(Docket Entry No. 10, Jones Declaration, Exhibit B at p. 14). Clevy's Retention Bonus Agreement, is dated July 7, 1999 with Carrier Corporation, a UTC subsidiary, and Clevy ("Transition Services Agreement"). *Id.* at Exhibit E. Based upon the ICP's disclosures to entice the ICP officers to tender their own shares as well as to recommend and solicit ICP shareholders to tender their own shares, plaintiff alleges that the Titan defendants provided the ICP officers with "incentive awards of up to $2 million upon the sale of the Company." *Id.* at ¶ 25. With these "incentive awards," plaintiff alleges that, with the tender offer, each ICP officer would receive a maximum of $2 million to endorse the tender offer and tender their own shares. *Id.*

### 3. The Performance Unit Awards

Another alleged enticement to the ICP officers to tender their ICP shares and recommend that ICP shareholders tender their shares, are agreements to provide ICP officers and others accelerated performance unit awards. Plaintiff alleges that the accelerated award is up to "$2.5 million multiplied by the number of years [the ICP officer has been] in the performance cycle." *Id.* at ¶ 25. The defendants and the ICP officers allegedly failed to disclose

the exact number of years in each ICP officer's "performance cycle", but the complaint specifically alleges that each insider will receive up to $2.5 million, multiplied by the number of years in the performance cycle. *Id.* These accelerated and improper awards are alleged to be part of Titan's tender offer because these awards are contingent upon the ICP officers tendering their ICP shares, negotiating Titan's tender offer, and the successful consummation of Titan's tender offer. The Titan's tender offer closed on August 9, 1999.

## B. Conclusions of Law

Before addressing the merits of this motion, the defendants submitted affidavits and the plaintiff attached documents to his complaint and incorporated by reference the Golden Parachutes agreements. The defendants argue that the Court may consider their affidavits in connection with their motion to dismiss. *See Teagardener v. Republic–Franklin Inc. Pension Plan,* 909 F.2d 947, 949 (6th Cir.1990), *cert. denied,* 498 U.S. 1027, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991) (holding that the district court on 12(b)(6) motion properly considered contract documents where contract and the "arguable meanings of its terms, were central to the plaintiffs' complaint"); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991) ("In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated into the complaint by reference. Of course, it may also consider matters of which judicial notice may be taken under Fed.R.Evid. 201.").

Under Fed.R.Civ.P. 10(c), any matters attached to the pleadings are considered part of the pleadings. Yet, under Fed. R.Civ.P. 12(b)(6), if the Court considers any matters outside the scope of the pleadings, the motion is deemed a motion for summary judgment. The Court, however, is not required to consider such matters, but the parties contend that courts allow such filings and references to the matter referred to in the pleadings.

In *Weiner v. Klais and Co., Inc.,* 108 F.3d 86 (6th Cir.1997), the Court reiterated the general rule that: "Matters outside the pleadings are not to be considered by the court in ruling on a 12(b)(6) motion to dismiss." *Id.* at 98 (citations omitted). To be sure, the Court noted an exception in securities cases, but only for papers filed by the defendant.

> The [District] court held ... it would consider 'only those exhibits submitted by the defendant which can properly be considered incorporated by reference into the complaint, and, thus, a part of the pleadings.' Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. *However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.* Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs complaint and are central to her claim." We believe that this approach is appropriate.

*Id.* at 89 (quoting *Venture Assocs. Corp v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)) (emphasis added and citations omitted.) *Accord, Nieman v. NLO, Inc.,* 108 F.3d 1546, 1555 (6th Cir.1997) ("documents that *a defendant* attaches to a motion are considered part of the pleadings if they are referred to in the plaintiffs' complaint and are central to her claim") (emphasis added).

■ The Court will consider the documents attached to and incorporated by reference into the complaint in resolving the pending motion to dismiss.

On a motion to dismiss, the Court must determine whether there are any circumstances in which the plaintiffs can state a claim for relief, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) under a notice pleading standard pursuant to Fed.R.Civ.P. 8. The complaint is to be construed in a light most favorable to the pleader. *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. To evaluate the legal sufficiency of a complaint, the Sixth Circuit observed that "our standard of review 'requires more than bare essentials of legal conclusions.'" *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995). "[W]e need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

Section 14(d)(7) prohibits a tender offeror from offering different consideration to different shareholders for the same shares and provides, in pertinent part, as follows:

Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

15 U.S.C. § 78n(d)(7). Section 14(d)(6) of the Securities Exchange Act, the companion section to Section 14(d)(7), requires equality of treatment of tendering shareholders where less than all of the outstanding shares of the target are sought. 15 U.S.C. § 78n(d)(6).

Section 14(d)(7)'s legislative history reflects Congress' "... purpose ... to assure fair treatment of those persons who tender their shares at the beginning of the tender period, and to assure equality of treatment among all shareholders who ten-

der their shares." S.Rep. No. 550, 90th Cong., 1st Sess., at 10 (1967). *See,* H.R.Rep. No. 1711, 90th Cong., 2d Sess., at 11 (1968), U.S.Code Cong. & Admin.News 1968, p. 2811; Cong.Rec. [Sen. Jan. 18, 1967] 856 (1967).

The Securities and Exchange Commission ("SEC") has promulgated Rule 14d–10, the "Equal Treatment of Security Holders," that provides, in pertinent part:

(a) No bidder shall make a tender offer unless: ...

(2) The consideration paid to any security bolder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.

17 C.F.R. § 240.14d–10(a)(2).

The SEC has expressed views similar to Congress for the purpose of its regulations:

[W]here the terms of a tender offer are changed by increasing the price or other consideration to be paid for the securities, all holders should be given the increased consideration for their securities whether their securities have been taken up prior to the change or not. The purpose of this provision is to remove a purely fortuitous factor from the calculation of the amount security holders should receive for their securities by assuring them of the same price for their securities regardless of when they are taken up, and to avoid the discriminatory effect of paying some holders more than others, since security holders tendering their shares pursuant to a tender offer normally assume that all tendering security holders will receive the same price.

*See* Proposed Amendments to Tender Offer Rules, Rule 14d–10(a)(2), which the SEC promulgated pursuant to Section 14(d)(7), Securities Act Release No. 33–6595, 33 S.E.C. Docket 762, 1985 WL 61507, at *3.

■ Plaintiff's theory is that the defendants' payments to the ICP officers, who

are also shareholders, violate the anti-discrimination provisions of Section 14(d)(7) as payments of additional consideration to the ICP officers for their stock under the guise of "sign-on" bonuses, "transition" or incremental bonuses, change of control bonuses and amendments to their employment agreements (Docket Entry No.1, Complaint at ¶¶3, 4, 21–22, and 24–30). These agreements are alleged to be parts of the tender offer and are *not* independent contractual agreements because these agreements were reached as part of the tender offer and were tied to the successful consummation of the tender offer. 14. at ¶¶2, 4, and 21–30. To underscore this tying relationship, plaintiff asserts that *"Titan had absolutely no obligation to make the payoff if the Tender Offer [were] not a success."* (Docket Entry No. 17, Plaintiff's Response to Defendants' Motion to Dismiss at p. 2).

As to the defendants' first contention of the lack of an implied right of action under Section 14(d)(7), the traditional analysis under the implied right of action doctrine is set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct.2080, 45 L.Ed.2d 26 (1975). In *Cort,* the Supreme Court established the following criteria for the determination of whether an implied private right of action arises from a statutory scheme:

> First, is the plaintiff 'one of the class for whose special benefit the statute was enacted'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. 2080 (citations omitted).

In *Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988), the Supreme Court restated these standards on finding a private right of action under a federal statute, but emphasized that the critical factor is legislative intent.

> In determining whether to infer a private cause of action from a federal statute, *our focal point is Congress' intent in enacting the statute . . . .* Our focus on congressional intent does not mean that we require evidence that members of Congress, in enacting the statute, actually had in mind the creation of a private cause of action. The implied cause of action doctrine would be a virtual dead letter were it limited to correcting drafting errors when Congress simply forgot to codify its evident intention to provide a cause of action. Rather, as an *implied* cause of action doctrine suggests, "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." We therefore have recognized that Congress' intent "may appear implicitly of in the language or structure of the statute, or in the circumstances of its enactment." *The intent of Congress remains the ultimate issue. however, and "unless this congressional intent can be inferred form the language of the statute. the statutory structure. or some other source. the essential predicate for implication of a private remedy simply does not exist."*

*Id.* at 179, 108 S.Ct. 513 (citations omitted and emphasis added). *Accord, Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund,* 794 F.2d 221, 229 (6th Cir.1986) (the *Cort* "standards are only guides to ascertaining legislative intent.") (citations omitted).

Applying *Cort,* the plaintiff, as a stockholder is a member of the class of persons Section 14(d)(7) was intended to protect. As the Second Circuit noted, "the primary intended beneficiaries of [the statute], since 'the sole purpose of the Williams Act

[is] investors who are confronted with a tender offer.' " *Field v. Trump,* 850 F.2d 938, 946 (2d Cir.1988) (citations omitted).

■ As to the second prong of the *Cort* test, Section 14(d)(7) provides that whenever any person "varies the terms of a tender offer" by "increasing the consideration offered to . . . [security holders] *such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer."* 15 U.S.C. § 78n(d)(7) (emphasis added). With the emphasized language on remedies, the Court concludes that Congress intended for individual investors to sue for this remedy under Section 14(d)(7). Although the SEC can sue for a Section 14(d)(7) violation, under Section 21(d)(1)(a) of the Exchange Act, 15 U.S.C. § 78u(d)(1), the relief available to the SEC is limited to injunctive relief. Under Section 21(d)(iii)(C) of that Act, 15 U.S.C. § 78u–1(d)(1), any penalties are paid into the Treasury of the United States. The SEC's remedies do not extend to "security holders." Thus, Congress must have intended an implied right of action for investors adversely affected by a violation of this statute. Defendants do not take issue with the fourth component of the *Cort* test.

Several courts have recognized a private right of action under § 14(d)(7) and Rule 14d–10. *See Epstein v. MCA. Inc.,* 50 F.3d 644 (9th Cir.1995), *rev'd on other grounds,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *Field,* 850 F.2d at 946; *Alidina v. Penton Media, Inc.,* 2000 WL 98025 (S.D.N.Y.2000); *Perera v. Chiron Corp.,* 1996 WL 251936 (N.D.Cal.1996); *Gerber v. Computer Assocs. Intern. Inc.,* 812 F.Supp. 361 (E.D.N.Y.1993). Accordingly, the Court concludes that all four prongs of the *Cort* test are satisfied and plaintiff has a private right of action to sue for damages pursuant to Section 14(d)(7).

As to the timing of the defendants' agreements, Rule 14d–10 provides that "[n]o bidder shall make a tender offer unless . . . [t]he consideration paid to any security holder **pursuant to the tender offer** is the highest consideration paid to any other security holder **during such tender offer."** 17 C.F.R. § 240.14d–10 (emphasis added). Plaintiff's claim is that defendants' various agreements to pay ICP officers a higher consideration violated Rule 14d–10 **pursuant to the tender offer.** (Docket Entry No. 1, Complaint at ¶¶ 3, 21–22, and 24–30). In the plaintiff's view, Rule 14d–10 reference to consideration paid **"pursuant to the tender offer,"** is free of any time limitation for such payments. The defendants argue that the agreements at issue were neither made nor paid "during [its] tender offer."

■ A split among the Circuits exists on this issue. The Seventh Circuit has a "Bright Line" rule that, in effect, uses the time limits in Rule 10b–13 to define "during the tender offer" in Section 14(d)(7). *Lerro v. Quaker Oats Co.,* 84 F.3d 239, 242–43 (7th Cir.1996). The Ninth Circuit has an "integral part of the tender offer" test that eschews the technical time deadlines in Rule 10b–13 and determines whether a particular transaction compromises the purposes of Section 14(d)(7). *Epstein,* 50 F.3d at 654–56.

■ The Second Circuit has employed tests similar to the Ninth Circuit. *Field,* 850 F.2d at 943–44 (2d Cir.1988) (that involved successive tender offers 'and the Second Circuit applied a "functional test" under which a court "scrutinizes such purchases in the context of various salient characteristics of tender offers and the purposes of the Williams Act") and other authorities cited therein.

The rationale of the Seventh Circuit test, as set forth in *Lerro,* is to achieve certainty in measuring when Section 14(d) applies and in recognition of marketplace realities for these transactions:

> Before the offer is not "during" the offer. The difference between "during" and "before" (or "after") is not just linguistic. *It is essential to permit everyone to participate in the markets near*

*the time of a tender offer. Bidders are forbidden to buy or sell on the open market or via negotiated transactions during an offer, see Rule 10b–13(a), but they are free to transact until an offer begins or immediately after it ends. Several courts accordingly have held that these transactions do not establish a floor under the price to be paid for shares tendered into the offer.*

*Purchases near in time to a tender offer but outside it may be essential to transactions that all investors find beneficial. Controlling shareholders often receive indirect or non-monetary benefits and are unwilling to part with their stock (and hence with control) for a price that outside investors find attractive. At the same time, potential bidders may be unable to profit by paying everyone the price essential to separate the insiders from their shares.* Suppose a firm's stock is trading for $20, insiders who hold 30 percent of the firm would not sell for less than $30, and a potential bidder values the entire firm at $25 per share. An offer of $25 for all stock would not attract the insiders' shares; and as a practical matter (if not a legal matter under some states' laws), failure to attract the control bloc would doom the offer. The transaction would be feasible, however, if the acquiror could pay $30 to the control group before the bid commences and acquire the rest of the stock at $22 per share, for an average price of $24.40. Everyone is better off: the public investors prefer $22 to $20; the control group is happy; the bidder anticipates a profit of 60 cents per share. Treating the Williams Act as a mandate for an identical price across the board—as opposed to an identical price for all shares acquired in the offer—would make all investors worse off.

Just as those who sell for $15 today cannot complain if their trading partner pays $20 to someone else tomorrow,

those who sell in the market a day before the offer starts are not entitled to the higher price paid to those who wait (nor are those who sell in the offer entitled to a higher price paid before or after its duration); the point of Rules 10b–13, 14d–10, and their cousins is to demark clearly the periods during which the special Williams Act rules apply. Once the offer begins, professional investors and amateurs receive the same price. That is the objective of Section 14(d)(7) and Rule 14d–10. Persons who make tender offers do not lose their ability to participate as investors for undefined periods "near" the time of the offer. *With millions or even billions of dollars at stake precise definition of the blackout period is essential and the SEC has accordingly consistently differentiated actions "during" an offer from those close to the offer's beginning or end. The line is arbitrary, to be sure, it invites transactions that use the rules for personal advantage ("tax planning" is a respected specialty of the bar. while "tax evasion" is a felony): but some line is essential, and it had best be a bright one.*

*Lerro,* 84 F.3d at 243 (emphasis added).

■ The Ninth Circuit's "integral part of the tender offer" rule is based upon the principle not to elevate form over substance, thereby avoiding mechanical application of Section 14(d)(7). Rather, the Ninth Circuit determines if the purposes of Section 14(d) are being compromised by a particular transaction with a stockholder. In summary, the Ninth Circuit reasoned that the federal securities laws do not provide a rigid time period for the tender offer, and that there is no basis to incorporate the time frame in Rule 10b–13 into Rule 14d–10. The Ninth Circuit's full reasoning is as follows [3]:

---

**3.** The Court regrets this extensive quotation from the Ninth Circuit's opinion, but the Court believes it is necessary to set forth the Ninth Circuit's full reasoning that is relied upon and adopted by this Court.

Matsushita [the offeror] argues that the Wasserman [stockholder and officer] transaction falls outside the Rule's ambit because it closed after the tender offer period expired. The tender offer period, Matsushita contends, ended when it accepted the tendered MCA shares for payment—at 12:05 am. on December 29, 1990, one hour and 20 minutes before Wasserman's shares were exchanged. In Matsushita's view, liability under Rule 14d–10 boils down to a pure question of timing: the Rule is simply a "mechanical provision" concerned with "payments to shareholders of a target corporation only during a specifically-defined tender offer period." ... Outside that period, Matsushita insists, "Rule 14d–10 is without effect" because the Rule "is engaged (or not engaged) depending upon when payment is made." *Id.* at 23, 35 (emphasis in original).

Although Matsushita argues that Rule 14d–10 is designed to operate only during a "specifically-defined tender offer period," neither the phrase "tender offer period" nor a specific time frame is to be found in the Rule's text. To be sure, section (a)(2) of the Rule prohibits paying one security holder more than another "during such tender offer." *But the term "tender offer," as used in the federal securities laws, has never been interpreted to denote a rigid period of time. On the contrary, in order to prevent bidders from circumventing the Williams Act's requirements, Congress, the SEC, and the courts have steadfastly refused to give the term a fixed definition. Instead, we have held that "[t]o serve the purposes of the Williams Act, there is a need for flexibility in fashioning a definition of a tender offer."*

Even if the language of Rule 14d–10(a)(2) were to provide a measure of support for Matsushita's timing argument, Matsushita would still be unable to account for the language of Rule 14d–10(c), which prohibits a bidder from "offer[ing] ... more than one type of consideration in a tender offer" if shareholders are not permitted to choose between the different types of consideration offered. (Emphasis added). Section (c)(1) makes no mention of payment and no mention of timing. Instead, Rule 14d–10(c)(1) prohibits a bidder such as Matsushita from offering a shareholder, such as Wasserman, not only consideration of greater value than that offered to other shareholders, but also consideration that is different from that offered to other shareholders. It endows each shareholder with the "equal right to elect among each of the types of consideration offered," regardless of when actual payment is made.

In promulgating Rule 14d–10, the SEC emphasized the need for "equality of treatment among all shareholders who tender their shares." Id., 1985 WL 61507, 1985 SEC LEXIS 1175 at *15 (quoting S.Rep. No. 550, 90th Cong., 1st Sess. 10 (1967)). It further characterized Rule 14d–10 as a substantive provision necessary to achieve the "investor protection purposes of the [1934] Exchange Act" and the Williams Act. SEC Release No. 34–22198, 1985 WL 61507, 1985 SEC LEXIS 1175 at *2 (July 1, 1985). At no point in its discussion of the Rule's purposes did the SEC suggest that the Rule's sole focus is the timing of payments.

Matsushita implicitly acknowledges that Rule 14d–10 does not contain a rigid time frame of its own when it urges us to read Rule 14d–10 as incorporating, sub silentio, the time frame set out in Rule 10b–13, which prohibits side purchases "from the time [a] tender offer or exchange offer is publicly announced or otherwise made known ... [to security holders] until the expiration of the period ... during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected.".

Matsushita offers no authority for incorporating Rule 10b–13's time frame

into Rule 14d–10. In promulgating the all-holders, best-price Rule in 1986, the SEC gave no hint that its new regulation would be governed by Rule 10b–13's time clock. Nor does the Williams Act fully incorporate Rule 10b–13's timing provisions. Rule 10b–13 prohibits bidders from making side deals during a fixed period of time; it does not purport to serve as a general definition of when a tender offer begins and ends. In fact, in Rule 14d–2, the SEC rejected the notion that Rule 10b–13 timing determines when tender offers start for purposes of section 14(d)(7) and the rules promulgated thereunder.

We therefore reject Matsushita's timing argument. Indeed, if adopted, it would drain Rule 14d–10 of all its force. Under Matsushita's reading, even the most blatantly discriminatory tender offer—in which large shareholders were paid twice as much as small shareholders—would fall outside Rule 14d–10's prohibition, so long as the bidder waited a few seconds after it accepted all of the tendered shares before paying the favored shareholders. Rule 14d–10's equality requirements, which "expressly preclude bidders from discriminating among holders of the class of securities that is the subject of the offer, either by exclusion from the offer or by payment of different consideration," SEC Release No. 34–23421, 1986 WL 71340, 1986 SEC LEXIS 1179 at *10 (July 11, 1986), cannot be so easily circumvented.

*An inquiry more in keeping with the language and purposes of Rule 14d–10 focuses not on when [the stockholder and officer] was paid. but on whether the transaction was an integral part of [the offeror's] tender offer. If it was, [the offeror] violated Rule 1 4d–10 because it paid him. pursuant to the tender offer, different, and more valuable consideration than it offered to other shareholders.*

"Courts faced with the question of whether purchases of a corporation's shares are privately negotiated or are part of a tender offer have applied a functional test that scrutinizes such purchases in the context of various salient characteristics of tender offers and the purposes of the Williams Act." *Id.* at 943–44. *See also* SEC Release No. 34–22198, 1985 WL 61507, 1985 SEC LEXIS 1175, at *7 (July 1, 1985) ("[T]he fact ....... different consideration is offered to different holders of the same class of securities, does not mean that a tender offer has not been made under the Williams Act. Rather, if such a transaction is found to be a tender offer, then the tender offer would not have been made in compliance with the all-holders requirement").

Because the terms of the Wasserman Capital Contribution and Loan Agreement were in several material respects conditioned on the terms of the public tender offer, we can only conclude that the Wasserman transaction was an integral part of the offer and subject to Rule 14d–10's requirements. Two facts compel this conclusion: first, the redemption value of Wasserman's preferred stock incorporated the tender offer price by reference, and second, the Capital Contribution and Loan Agreement was conditioned on the tender offer's success. If the tender offer failed, Wasserman would have remained the owner of his MCA stock. This is precisely the arrangement Matsushita made with its shareholders through its public tender offer: if an insufficient number of shares were tendered, each shareholder too would have retained ownership of her MCA stock. The deal Matsushita made with Wasserman thus differed from the tender offer in only one material respect—the type (and possibly the value) of consideration provided. Rule 14d–10(c)(1) forbids just such a transaction.

To be sure, the fact that a private purchase of stock and a public tender offer are both part of a single plan of acquisition does not, by itself, render the purchase a part of a tender offer for

purposes of Rule 14d–10. Rule 14d–10 does not prohibit transactions entered into or effected before, or after, a tender offer—provided that all material terms of the transaction stand independent of the tender offer. Thus a bidder who purchases shares from a particular shareholder before a tender offer begins does not violate Rule 14d–10.

*Epstein,* 50 F.3d at 654–56 (emphasis added) (quoting *SEC v. Carter Hawley Hale Stores Inc.,* 760 F.2d 945, 950 (9th Cir. 1985)).

In the Court's view, the most factually analogous precedent is *Perera* where the acquiring firm agreed with the acquired firm to give enhancements to its employee shareholders. The plaintiffs in *Perera* alleged that these enhancements were premiums intended to encourage employee shareholders to support the tender offer and tender their own shares, 1996 WL 251936 at *3. The Court deemed the enhancements to be an "integral" part of the tender offer because the enhancements were conditioned on a successful tender offer. *Id.* The Court concluded: "Rule 14d–10 still forbids 'sweetening the pot' for certain shareholders but not others." *Id.* at *4.

■■■ A guiding rule for this Court is the overarching principle that the securities laws are remedial in nature and are to be broadly construed to achieve the statutes' purposes. *Pinter v. Dahl,* 486 U.S. 622, 652, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

The Court has acknowledged that "it is proper for a court to consider ... policy considerations in construing terms in [the federal securities] Acts." And the court has recognized that Congress had "broad remedial goals" in enacting securities laws and providing civil remedies. Accordingly, the Court itself has construed securities law provisions "not technically and restrictively, but flexibly to effectuate [their] remedial purposes."

*Id.* at 652, 108 S.Ct. 2063 (quoting *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 695, n. 7, 105 S.Ct. 2297, 2307, n. 7, 85 L.Ed.2d 692 (1985) and *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741(1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963) with other citations omitted)). As the Second Circuit stated: "In recognition of Congress' desire in enacting the Williams Act to avoid favoring either existing corporate management or outsiders seeking control through tender offers ... the role of the courts in construing and applying the Act must likewise be one of strict neutrality." *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir.1985).

Thus, the Court adopts the "integral part of the tender offer" and "functional" tests of the Second and Ninth Circuits because the principal thrust of these tests serves the congressional purpose expressed in Section 14(d) and its legislative history, as well as the SEC's view as expressed in Rule 14d–10. The Court declines to adopt the Seventh Circuit's bright line rule with its time constraints, but there is clearly merit in a bright line rule approach. In this Court's view, the controlling issue is whether these types of financial incentive agreements with any stockholder of the acquired company are integrally tied to successful completion of Titan's tender offer.

As applied here, the Court concludes that Titan's various incentive agreements with ICP officers who are also shareholders, are integral parts of Titan's tender offer and constitute additional consideration to some shareholders and are subject to Section 14(d)(7) and Rule 14d–10. Titan allegedly agreed to pay and/or paid the ICP corporate officers additional consideration of as much as $30 million to ensure the acquisition. Such consideration was offered or paid primarily, if not exclusively, as an inducement to support Titan's tender offer. Such agreements were en-

tered into months shortly before the formal announcement of Titan's tender offer for ICP stock. These incentive agreements paid off only if Titan's tender offer were successful. These financial agreements are integral parts of Titan's tender offer.

The defendants argue that as a matter of law, the agreements for additional consideration at issue here, are "collateral agreements to the tender offer and as such, the provisions of the Williams Act do not apply." *Brill v. Burlington Northern Inc.*, 590 F.Supp. 893, 900 (D.Del.1984). Yet, *Brill* predates the enactment of Section 14(d)(7) in 1986 and the Court declines to follow *Brill.*

The defendants next argue that these financial incentive agreements are not additional consideration for these ICP officers' shares, but rather are employment incentive arrangements to compensate ICP management, if at all, for their continual employment. Defendants note that payment under the Golden Parachute agreement is *not* contingent upon the tendering of shares. The Transition Services Agreement also confers payments upon continued employment with ICP, not upon the tendering of shares. The Sign On Bonus is not contingent upon the tendering of shares. Likewise, ICP's Annual Incentive Plan, the basis of the accelerated incentive awards, is part of ICP's pre-existing compensation package for its key employees. The defendants also argue the notion that UTC would pay a higher price for the ICP officers' shares is an implausible proposition, because the tendering of their shares would have been immaterial to the success of the tender offer.

The fact that the tender offer would have gone forward, even if the ICP Insiders did not tender their own shares is unavailing. *See Chiron*, 1996 WL 251936, at \*3 ("Nor does the ultimate oversubscription of the Tender Offer, which makes it unlikely that the enhancements were needed. to ensure its success, get [the offeror] off the hook. Rule 14d–10 still forbids 'sweetening the pot' for certain shareholders but not others.").

In the Court's view, the precise issue is whether these incentive contracts constitute an integral part of Titan's tender offer. Here, these agreements were executed in close connection with Titan's tender offer. The ICP officers' contractual rights are tied to the success of Titan's tender offer. These officers are shareholders and these agreements are inextricably joined with Titan's tender offer, the success of the acquisition and these officers' support of the acquisition.

The defendants' final argument is that the Golden Parachute agreements were between the ICP officers and ICP. Neither UTC nor Titan is a party to the Golden Parachutes agreements. Courts have held that Section 14d(7) and Rule 14d–10 apply only to tender offer bidders, not the target company. *See Priddy v. Edelman*, 679 F.Supp. 1425, 1431 (E.D.Mich.1988), *affd. on other grounds*, 883 F.2d 438 (6th Cir. 1989) ("the language of both the statute [Section 14(d)(7) ] and the rule [Rule 14d–10] is applicable by its terms only to a bidder"). Thus, the defendants argue that any transactions entered into between the target, ICP, and its management, as a matter of law, can not violate the Best Price Rule. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 779 (2d Cir.1991) (adjustments to equity ownership and stock option plans that allowed top management of the target company to receive superior consideration did not violate Best Price Rule because, *inter alia*, it was the target company, rather than the offeror, that had agreed to the adjustments).

The Court agrees that as a general rule, incentive contacts between a company and its key officers and executives are not subject to Section 14(d)(7), but these agreements with ICP officers were executed solely in the context of the Titan's tender offer agreement between Titan and ICP. In this factual context, construing the factual allegations in a light most favorable to

the plaintiff as required by this type of motion, the Court concludes that these agreements could be found to have been induced by Titan as part of its tender offer for ICP and not as contracts solely between ICP and its officers. In the former instance, those agreements are subject to Section 14(d)(7) and Rule 14d–10.

### 1. Plaintiff's Motion to Appoint Lead Counsel

Also pending before the Court is the plaintiffs motion to have its counsel appointed lead counsel (Docket Entry No. 11) that is unopposed. This action is subject to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, that amended the Securities Act of 1933, 15 U.S.C. § 77a–77bbbb, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a–78*lll* and applies to private class actions. 15 U.S.C. § 77z–1(a)(1). Congress enacted the PSLRA in response to the perceived abuses of the class action procedure. *Fischler v. AmSouth Bancorporation,* 1997 U.S.Dist. LEXIS 2875, No 96–1567–Civ–T–17A, 1997 WL 118429, at \*1 (M.D.Fla. Feb.6, 1997) (citing H.Conf. Rep. No. 104–369, at 31 (1996)). As pertinent here, "[t]he manifest intent of the [PSLRA] is determining the plaintiff most capable of pursuing the action and representing the interest of the class." *Id.* at \*2 (citing H.Conf.Rep. No. 104–369, at 34).

Among the PSLRA's threshold requirements is notice to potential class members upon the filing of the first class action. 15 U.S.C. § 78u–4. Under these provisions, the named plaintiffs in the first filed action must publish the notice within twenty days of filing the action to inform potential class members of their right to move to be appointed lead plaintiffs. 15 U.S.C. § 78u–4(a)(3)(A)(i). The published notice should instruct potential class members "that, *no later than 60 days after the date on which the notice is published,* any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C.A. § 78u–4(a)(3)(A)(i)(II) (emphasis added). Such

notice must be published "in widely circulated national business-oriented publication or wire service." 15 U.S.C.A. § 78u–4(a)(3)(A)(i). "If more than one action on behalf of a class asserting substantially the same claim or claims arising under the chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i)." 15 U.S.C.A. § 78u–4(a)(3)(A)(ii) (emphasis added).

Here, it is undisputed that the required notices have been provided by publications in national news media outlets by the plaintiff.

Once adequate notice is given, PSLRA sets out a two-step process for appointing the lead plaintiff of which the first step is to decide whether to consolidate the actions.

> If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter ... has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, *the court shall not make the [lead plaintiff] determination until after the decision on the motion consolidate is rendered.*

15 U.S.C. § 78u–4(a)(3)(B)(ii) (emphasis added). The second step is the selection of adequate plaintiff whose counsel will be lead counsel for litigation subject to Court approval. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). Yet, here, there is only one action.

The PSLRA also requires that the Court appoint lead plaintiffs whose claims are "typical" of the claims of the class and who will "fairly and adequately protect the interest of the class." Fed.R.Civ.P. 23(a)(3)–(4); 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I)(bb). In a word, "as goes the claims of the named plaintiffs so goes the claims of the class." *Sprague v. General Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998). The presumption can be rebutted "only upon proof ___ that the presumptively most adequate plaintiff ... will not fairly and ade-

quately protect the interests if the class". *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 149 (D.N.J.1998) (quoting 15 U.S.C. §§ 77z–1(a)(3)(B)(iii)(II)(aa), (bb)).

As one Court observed, "while it is clear that determination of lead plaintiff and lead counsel are separate questions, ... in most cases, these issues are decided concurrently." *Fischler v. AmSouth Bancorporation*, 1997 WL 118429, at * 1 (M.D.Fla.1997). "The role of class action counsel is akin to that of a fiduciary to the absent class members." *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir.1973). "[C]lass action counsel possess, in a very real sense, fiduciary obligations to those not before the court." *Id.*

As applied here, the Court finds that plaintiff's claims met the typicality requirements and plaintiff and his counsel are experienced and will adequately protect the interests of all class members. Thus, the plaintiff's motion for appointment of his counsel as lead counsel is granted.